# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Germantown Cab Company, Bucks County Services, Inc., Concord Limousine, Inc., Dee Dee Cab Company and MCT Transportation, Inc. | : : : : : : | |
| v. | : : | No. 1989 C.D. 2016 |
| Philadelphia Parking Authority | : : | |
| Appeal of: Bucks County Services, Inc. | : : | |
| Germantown Cab Company, Bucks County Services, Inc., Concord Limousine, Inc., Dee Dee Cab Company and MCT Transportation | : : : : : | |
| v. | : : | No. 1990 C.D. 2016 Argued: May 1, 2017 |
| Philadelphia Parking Authority | : : | |
| Appeal of: Germantown Cab Company | : | |

BEFORE:  HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE JULIA K. HEARTHWAY, Judge[1]
          HONORABLE JAMES GARDNER COLINS, Senior Judge


**OPINION BY JUDGE BROBSON**       **FILED:  September 13, 2017**


In these consolidated appeals, Appellants Bucks County Services, Inc.

(BCS) and Germantown Cab Company (GCC) (collectively, Appellants) appeal

---

[1] This decision was reached before Judge Hearthway's service with the Court ended on September 1, 2017.

from the order of the Court of Common Pleas of Philadelphia County (common pleas), dated November 2, 2016. Common pleas denied Appellants' appeal and affirmed the decision of the Philadelphia Parking Authority (Authority), upholding the Authority's annual assessments for fiscal year 2015 imposed upon Appellants pursuant to Section 5707 of the Parking Authorities Law (Law).[2] For the reasons set forth below, we reverse.

## I. BACKGROUND

This case involves the latest of many legal challenges to the Authority's regulation of taxicab operations in the City of Philadelphia (City). The following provides a summary of the evolving regulation of what are referred to as "partial rights" taxicabs within the City.

## A. Pre-Act 94

Appellants hold certificates of public convenience originally granted by the Pennsylvania Public Utility Commission (PUC), which authorize Appellants to provide call and/or demand taxicab service in designated areas of Pennsylvania, including designated portions of the City. Appellants are considered partial rights taxicab companies, because they have been given authority to serve part, but not all, of the City. Prior to 2004, the PUC was solely responsible for the regulation of taxicab operations throughout Pennsylvania, including the City. With respect to taxicab service provided within the City, the PUC's duties and responsibilities were set forth in the Medallion Act, 66 Pa. C.S. §§ 2401-2416 (repealed 2004). Although Appellants were authorized to operate in designated areas in the City, they were not subject to the provisions of the Medallion Act because they are not

_____
[2] 53 Pa. C.S. § 5707.

medallion taxicabs—*i.e.*, taxicabs that are authorized to provide call or demand taxicab service on a citywide basis. 53 Pa. C.S. § 5701; *see also Bucks Cnty. Servs., Inc. v. Phila. Parking Auth.*, 104 A.3d 604, 610 (Pa. Cmwlth. 2014) (recognizing that the definition of taxicab under Section 5701 of the Law, 53 Pa. C.S. § 5701, includes "medallion taxicabs, which operate on a citywide basis . . . ."). Rather, partial rights taxicabs were regulated pursuant to the Public Utility Code, 66 Pa. C.S. §§ 101-3316, and the PUC's associated regulations.

## B. Act 94 and *MCT Transportation*

In 2004, the General Assembly repealed the Medallion Act and transferred jurisdiction and regulation of taxicab service within the City from the PUC to the Authority through an amendment to the Law,[3] commonly referred to as Act 94.[4] The new regulatory regime established by Act 94 is set forth in Chapter 57 of the Law. Following the passage of Act 94, Section 5708 of the Law established the Philadelphia Taxicab and Limousine Regulatory Fund (Fund), which serves as the primary funding source for the Authority's regulation of taxicab service within the City. The Fund derives its revenue from the assessments and fees paid by the three utility groups—*i.e.*, taxicabs, limousines, and dispatchers—regulated by the Authority. 53 Pa. C.S. § 5708(a).

Initially, the Authority's annual budget and fee schedule was established and approved using the process set forth in former Section 5707(b) of the Law.[5] In *MCT Transportation, Inc. v. Philadelphia Parking Authority*,

---

[3] 53 Pa. C.S. §§ 5501-5517, 5701-5745. The Law is part of the General Local Government Code. *See* 53 Pa. C.S. § 101.

[4] Act of July 16, 2004, P.L. 758.

[5] Former Section 5707(b) of the Law provided:

**(Footnote continued on next page…)**

3

60 A.3d 899 (Pa. Cmwlth.), *aff'd per curiam*, 81 A.3d 813 (Pa.) and 83 A.3d 85 (Pa. 2013), however, this Court held that former Section 5707(b) of the Law was unconstitutional. In that case, Appellants and certain other partial rights taxicab companies argued that former Section 5707(b) of the Law was facially unconstitutional because it was "devoid of any guidance, standards or restrictions upon the [Authority's] power to formulate its annual budget and annual fee schedule." *MCT Transportation*, 60 A.3d at 913. After reviewing the language of former Section 5707(b), this Court concluded that the words "necessary to advance the purposes of this chapter" expressed a broad grant of authority and imposed no limit on the creation of a budget and fee schedule. *Id.* at 914. This Court

---

**(continued…)**

Fiscal year budget and fees.—The fiscal year for the fund shall commence on July 1 of each year. Before March 15 of each year, the [A]uthority shall submit a budget and proposed fee schedule, necessary to advance the purposes of this chapter, for the coming fiscal year along with comprehensive financial data from the past fiscal year to the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives. Unless either the Senate or the House of Representatives acts to disapprove through adoption of a resolution by April 15 of each year, the [A]uthority fee schedule shall become effective. The [A]uthority shall notify all certificate holders of the fee schedule for the coming fiscal year. The procedure for notifying certificate holders must be specified in the regulations of the [A]uthority. If either the Senate or the House of Representatives acts to disapprove the [A]uthority's fee schedule and budget, the [A]uthority may submit a revised budget and fee schedule to the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives within 15 days of such disapproval or shall utilize the fee schedule and budget for the prior year. Unless either the Senate or the House of Representatives acts to disapprove, through adoption of a resolution within ten legislative days from the date of submission of the revised budget and fee schedule, the revised budget and fee schedule of the [A]uthority shall become effective.

explained that it was for the General Assembly to decide what was "necessary," not the Authority. *Id.* This Court concluded further that "the amount that a state agency should spend on itself does not lend itself to easily identifiable standards[,]" and, therefore, our Constitution has established an elaborate budgeting process pursuant to Section 610(b) of the Administrative Code of 1929.[6] *Id.* This Court also concluded that the language set forth in former Section 5708 of the Law that required the Authority to allocate certain costs in a "fair and equitable" manner did not correct the constitutional problem contained in Section 5707. *Id.* This Court stated that the Authority's "fee schedule is driven by what the [Authority] determines its annual budget should be, and the costs of funding that budget are apportioned among utilities in any way whatsoever, whether fair or unfair." *Id.* As a result, this Court held that former Section 5707(b) of the Law was an unconstitutional delegation of legislative power to the Authority in violation of the separation of powers doctrine, because "[t]he General Assembly ha[d] failed to establish standards directing the [Authority's] exercise of discretion in deciding how much to spend each year" on the regulation of taxicab and limousine service within the City.[7] *Id.* at 915.

---

[6] Act of April 9, 1929, P.L. 177, added by the Act of September 27, 1978, P.L. 775, 71 P.S. § 230(b).

[7] This Court also held that former Section 5707(b) of the Law was unconstitutional because it condemned property without due process of law in violation of the due process provisions of the Pennsylvania and United States Constitutions—*i.e.*, it required Appellants and certain other partial rights taxicab companies to pay an assessment if they desired to stay in business without the opportunity to ever challenge such assessment. *MCT Transportation*, 60 A.3d at 919.

### C. Act 64 – Changes to the Authority's Budget and Assessment Process Post-*MCT Transportation*

Following this Court's decision in *MCT Transportation*, the General Assembly instituted a new process for establishing the Authority's budget, fee schedule, and annual assessments through the enactment of Act 64 of 2013 (Act 64).[8]  Act 64 amended Sections 5707 and 5708 of the Law and added Sections 5701.1 and 5710 to the Law.  Section 5707 of the Law, which establishes, *inter alia*, the procedure for the submission and approval of the Authority's budget, the calculation and payment of the annual assessment, and the maintenance of the Authority's budget-related records, now provides, in pertinent part:

(a) Budget submission.—

(1) The [A]uthority shall prepare and, through the Governor, submit annually to the General Assembly a proposed budget consistent with Article VI of the [A]ct of April 9, 1929 (P.L. 177, No. 175),[9] known as The Administrative Code of 1929, consisting of the amounts necessary to be appropriated by the General Assembly out of the funds established under section 5708 (relating to funds) necessary for the administration and enforcement of this chapter for the fiscal year beginning July 1 of the following year.  The [A]uthority shall be afforded an opportunity to appear before the Governor and the Appropriations Committee of the Senate and the Appropriations Committee of the House of Representatives regarding its proposed budget.  Except as provided in section 5710 (relating to fees), the [A]uthority's proposed budget shall include a proposed fee schedule.

(2) The [A]uthority's proposed budget shall include an estimate of the amount of its expenditures

---

[8] Act of July 9, 2013, P.L. 455.

[9] 71 P.S. §§ 229-240.5.

6

necessary to meet its obligation to administer and enforce this chapter. The [A]uthority shall subtract from the expenditure estimate:

>(i) The estimated fees to be collected under section 5710 during the fiscal year.

>(ii) Money deposited into the [F]und as payment for assessments, fees or penalties and any other moneys collected pursuant to this chapter but not allocated during a prior fiscal year. Unallocated assessment revenue from a prior fiscal year shall be applied to reduce the portion of the total assessment applicable to the utility group from which the unallocated assessment originated.

>(iii) Money budgeted for disbursement from the medallion fund, if any, as part of the [A]uthority's estimated budget.

(3) The remainder so determined, herein called the total assessment, shall be allocated to and paid by the utility groups identified in subsection (c) in the manner prescribed.

(4) If the [A]uthority's budget is not approved by March 30, the [A]uthority may assess the utility groups on the basis of the last approved operating budget. At the time the budget is approved, the [A]uthority shall make any necessary adjustments in the assessments to reflect the approved budget. If, subsequent to the approval of the budget, the [A]uthority determines that a supplemental budget is needed, the [A]uthority shall submit its request for that supplemental budget simultaneously to the Governor and the chairman of the Appropriations Committee of the Senate and the chairman of the Appropriations Committee of the House of Representatives.

(b) Records.—The [A]uthority shall keep records of the costs incurred in connection with the administration and enforcement of this chapter. The [A]uthority shall also keep a record of the manner in which it determined the amount assessed against every utility group. Such records shall be open to inspection by all interested parties. The records of the [A]uthority shall be considered prima facie evidence of the

7

facts and data therein represented, and, in a proceeding instituted to challenge the reasonableness or correctness of any assessment under this section, the party challenging the same shall have the burden of proof.

(c) Assessments.—

(1) The following relate to assessments for taxicabs:

(i) The taxicab utility group shall be comprised of each taxicab authorized by the [A]uthority pursuant to sections 5711(c) (relating to power of [A]uthority to issue certificates of public convenience) and 5714(a) and (d)(2) (relating to certificate and medallion required).

(ii) On or before March 31 of each year, each owner of a taxicab authorized by the [A]uthority to provide taxicab service on a non-citywide basis shall file with the [A]uthority a statement under oath estimating the number of taxicabs it will have in service in the next fiscal year.

(iii) *The portion of the total assessment allocated to the taxicab utility group shall be divided by the number of taxicabs estimated by the [A]uthority to be in service during the next fiscal year, and the quotient shall be the taxicab assessment. The taxicab assessment shall be applied to each taxicab in the taxicab utility group and shall be paid by the owner of each taxicab on that basis.*

(iv) The [A]uthority may not make an additional assessment against a vehicle substituted for another already in taxicab service during the fiscal year and already subject to assessment as provided in subparagraph (iii). The [A]uthority may, by order or regulation, provide for reduced assessments for taxicabs first entering service after the initiation of the fiscal year.

(v) The taxicab assessment for fiscal years ending June 30, 2013, and June 30, 2014, shall be $1,250.

(Emphasis added.)

This Court previously summarized the new budgeting and assessment process established by Act 64—the amendments to Sections 5707 and 5708 of the Law and the addition of Sections 5701.1 and 5710 to the Law—in our unreported decision in *Germantown Cab Company v. Philadelphia Parking Authority* (Pa. Cmwlth., No. 586 M.D. 2014, filed December 14, 2015), *aff'd*, 150 A.3d 16 (Pa. 2016):[10]

> Section 5707(a)(1) of the [Law] requires the [Authority] to submit a proposed budget to the General Assembly for its annual appropriation, which comes from two special funds: the [Fund], which is the [Authority's] primary operating fund, and the Medallion Fund. Section 5707(a)(2) instructs the [Authority] to estimate the "amount of its expenditures necessary to meet its obligation to administer and enforce Chapter 57." 53 Pa. C.S. § 5707(a)(2). That estimate is the starting point for establishing the total annual assessment. From that estimate, the following amounts are deducted: fees expected to be collected during the upcoming fiscal year; amounts in the [Fund] not spent in the prior fiscal year; and amounts to be withdrawn from the Medallion Fund. The remainder constitutes the "total assessment," which is "allocated to and paid by" the three utility groups that are regulated by the [Authority], namely, the taxicab utility group, the limousine utility group and the dispatcher utility group. 53 Pa. C.S. § 5707(a)(3).
>
> Relevant to this case is the taxicab utility group, which is comprised of medallion taxicabs . . . and partial rights taxicabs . . . . Assessments for the taxicab utility group are imposed per vehicle. *See* Section 5707(c)(1) of the [Law]. Each owner of a taxicab files annually "a

---

[10] Pursuant to Commonwealth Court Internal Operating Procedure 414(a), "an unreported panel decision of this [C]ourt issued after January 15, 2008, [may be cited] for its persuasive value, but not as binding precedent."

9

statement under oath estimating the number of taxicabs it will have in service in the next fiscal year." 53 Pa. C.S. § 5707(c)(1)(ii). The [Authority] divides the total assessment amount "by the number of taxicabs estimated by the [A]uthority to be in service during the next fiscal year." 53 Pa. C.S. § 5707(c)(1)(iii).

Section 5707.1 of the [Law] provides for assessment notice and hearings. The [Authority] must serve notice of the assessment to each taxicab owner and the "assessment must be paid within 30 days of service." 53 Pa. C.S. § 5707.1(a)(2). A taxicab owner may challenge its assessment as "excessive, erroneous, unlawful or otherwise invalid" and obtain a hearing on that challenge. 53 Pa. C.S. § 5707.1(b)(1). However, the filing of a challenge petition "does not relieve the owner of the obligation to pay the assessment within the specified time frame." 53 Pa. C.S. § 5707.1(b)(3). Further, the [Law] forbids the institution of a court proceeding "in a court for the purpose of restraining or delaying the collection or payment of an assessment." 53 Pa. C.S. § 5707.1(c). The [Authority] is empowered, *inter alia*, to revoke a taxicab owner's operating privileges if the assessment is not paid. 53 Pa. C.S. § 5707(d.1).

Finally, Section 5710 of the [Law] empowers the [Authority] to "collect fees necessary for the administration and enforcement of this chapter." 53 Pa. C.S. § 5710(a). Fees cover such items as vehicle inspections, for bouncing a check or for the transfer of a certificate of public convenience. The [Authority] posts the fee schedule on its website. *Id.* Section 5710(b) set the fee schedule for fiscal years ending June 30, 2013, and June 30, 2014, but not thereafter.

*Germantown Cab Co.*, slip op. at 1-2 (footnotes omitted).

### D. The Authority's Budget and Assessment Process for Fiscal Year 2015

In October 2013, the Authority's Board approved an annual budget and fee schedule for fiscal year 2015 and submitted them to the Governor and General Assembly for approval. (GCC Reproduced Record (GCC R.R.)

at 148a-49a, 196a-97a, 205a, 439a-45a.) The Authority's budget estimated total expenses for all three utility groups in the amount of $7,572,123, of which $6,739,189 was allocated to the regulation of taxicabs. (*Id.* at 147a-48a, 440a.) After subtracting its projected taxicab revenue from its total taxicab expenses, the Authority identified a shortfall in the taxicab budget in the amount of $2,438,972. (*Id.* at 440a, 446a.) This shortfall became the total assessment for taxicabs, as set forth in Section 5707(a)(3) of the Law. (*Id.* at 440a, 446a.)

Pursuant to Section 5707(c)(1)(iii) of the Law, the Authority's Taxicab and Limousine Division (TLD) estimated that 1,674 taxicabs would be in service during fiscal year 2015, which included 1,599 medallion taxicabs and 75 partial rights taxicabs. (*Id.* at 155a-56a.) In reaching its estimate of 75 partial rights taxicabs, the TLD relied upon: (1) the number of taxicabs identified by those partial rights taxicab companies that filed PR-1 forms with the Authority by the March 31 deadline under Section 5707(c)(1)(ii) of the Law; and (2) the Authority's estimate of taxicabs that would be in service for those partial rights taxicab companies that did not submit a timely PR-1 form to the Authority. (*Id.* at 156a-87a.) The Authority was not, however, required to use the number of taxicabs identified by the partial rights taxicab companies on their PR-1 forms in its estimate. (*Id.* at 217a.) In addition, the Authority did not allocate a specific number of taxicabs from its estimate to each of the partial rights taxicab companies that did not file a timely PR-1 form. (*Id.* at 160a-62a.) Thereafter, the Authority determined that the annual assessment for fiscal year 2015 would be $1,457 per taxicab, which amount was calculated by dividing the total assessment for taxicabs, or $2,438,972, by the number of taxicabs the Authority estimated would be in service for fiscal year 2015, or 1,674. (*Id.* at 193a-94a, 203a-07a.)

11

In August 2014, the Authority provided Appellants and the other partial rights taxicab companies with notices of the assessment pursuant to Section 5707.1(a) of the Law. (*Id.* at 271a-72a, 304a-05a, 447a.) The notices of assessment: (1) advised Appellants and the other partial rights taxicab companies of the $1,457 per taxicab assessment for fiscal year 2015; (2) set forth the total amount of each of their assessments; and (3) advised them that the assessments must be paid within thirty days. (*Id.* at 305a, 308a, 447a.) The Authority assessed BCS; Dee Dee Cab, Inc.; MCT Transportation, Inc.; and Concord Coach Limousine, Inc. based upon the number of taxicabs identified on their timely-filed PR-1 forms (BCS twelve taxicabs; Dee Dee Cab, Inc. one taxicab; MCT Transportation, Inc. ten taxicabs; and Concord Coach Limousine, Inc. ten taxicabs). (*Id.* at 163a-64a, 193a-94a, 201a, 211a, 267a, 271a-72a.) Because GCC failed to file a timely PR-1 form, the Authority estimated GCC's assessment based upon GCC's previous filings and assessed GCC for 169 taxicabs.[11] (*Id.* at 95a-96a, 201a, 211a, 220a-23a.) Even though the Authority estimated that only 1,674 taxicabs would be in service during fiscal year 2015 for the purpose of determining the per taxicab assessment of $1,457, the Authority assessed a total of 1,801 taxicabs: 1,599 medallion taxicabs and 202 partial rights taxicabs. (*Id.* at 204a-07a.) The Authority made no adjustment to the $1,457 per taxicab

---

[11] In August 2014, after being cited and shut down for its failure to file a PR-1 form for fiscal year 2015, GCC filed its PR-1 form, identifying 174 taxicabs. (R.R. at 228a, 278a-83a.) GCC believed that the PR-1 form was simply an informational filing that was not to be used for assessment purposes and that it was required to identify its entire fleet on the PR-1 form for safety reasons. (*Id.* at 275a-76a, 284a.) GCC specifically indicated on the PR-1 form that it reserved the right to amend the form if the form was to be used for assessment purposes, because the number of vehicles would be different. (*Id.* at 285a-86a.)

assessment for the increased number of taxicabs that were actually assessed. (*Id.* at 245a-46a.) Any extra money received by the Authority is placed into the Fund and is carried over to the next fiscal year. (*Id.* at 246a-48a.)

Appellants did not pay their assessments for fiscal year 2015. (*Id.* at 267a, 311a.) As a result of GCC's failure to pay the assessment, the Authority placed GCC out of service. (*Id.* at 311a.) Thereafter, GCC amended its PR-1 form, filed the PR-1 form with the Authority, and paid an assessment based on the twenty-five taxicabs that it had identified on its amended PR-1 form. (*Id.* at 312a-13a, 316a-18a.) The Authority, however, did not act on the amended PR-1 form or recalculate GCC's assessment, because the Authority took the position that if it were to accept amended PR-1 forms after the per taxicab assessment had already been calculated, it may not receive sufficient funds to cover the shortfall in its budgeted expenses. (*Id.* at 229a-30a, 240a, 249a.)

### E. Appellants' Challenge to the Assessment for Fiscal Year 2015

On August 22, 2014, Appellants filed with the Authority a Petition for Relief pursuant to Section 5707.1 of the Law (Petition), wherein they challenged their assessments on the basis that they were excessive, unreasonable, erroneous, unlawful, unconstitutional, against the public interest, and otherwise invalid. A hearing on Appellants' Petition was held before a TLD Hearing Officer (Hearing Officer) on November 21, 2014. Thereafter, on January 15, 2015, the Hearing Officer issued a recommended decision, denying Appellants' Petition. In so doing, the Hearing Officer noted that he did not have jurisdiction to decide the constitutional challenge because such issues were pending before this Court in

13

*Germantown Cab Company v. Philadelphia Parking Authority*, docket number 586 M.D. 2014.[12] (Hearing Officer Decision at 8, 15.) In the event that it was later determined that he should have done so, however, the Hearing Officer addressed Appellants' constitutional issues and concluded that Sections 5707, 5707.1, 5708, and 5710 were constitutional. (Hearing Officer Decision at 15.) Appellants filed Exceptions to the Hearing Officer's recommended decision on January 30, 2015. On September 22, 2015, the Authority issued a decision and order, affirming the recommended decision of the Hearing Officer. Appellants appealed the Authority's decision and order to common pleas. On November 2, 2016, following oral argument, common pleas issued an opinion and order denying Appellants' appeal and affirming the decision of the Authority. Appellants then appealed to this Court.

## II. DISCUSSION

On appeal,[13] GCC argues that the Authority's assessment against GCC for fiscal year 2015 is invalid, void, and unenforceable because

---

[12] This Court has since issued a decision in *Germantown Cab Company v. Philadelphia Parking Authority* (Pa. Cmwlth., No. 586 M.D. 2014, filed December 14, 2015). In that decision, this Court dismissed GCC's petition for review filed in this Court's original jurisdiction, concluding that the statutory remedy set forth in Section 5707.1(b)(1) of the Law precluded GCC's request for declaratory relief—*i.e.*, the proper venue for GCC to raise its constitutional issues was in an assessment appeal before the Authority, such as the present case.

[13] The Authority functions as a Commonwealth agency in matters involving taxicabs and limousines. *Blount v. Phila. Parking Auth.*, 965 A.2d 226, 234 (Pa. 2009). This Court's review of a Commonwealth agency adjudication is limited to determining whether constitutional rights were violated, whether agency procedures were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Sule v. Phila. Parking Auth.*, 26 A.3d 1240, 1242 n.4 (Pa. Cmwlth. 2011). A challenge to the constitutionality of a statute presents a pure question of law and the scope of review is plenary. *Peake v. Commonwealth*, 132 A.3d 506, 516 n.14 (Pa. Cmwlth. 2015).

Section 5707(c) of the Law:[14]    (1) is arbitrary and unreasonable; (2) violates GCC's substantive due process rights; and (3) violates GCC's right to equal protection and the Uniformity Clause of the Pennsylvania Constitution.  Similarly, BCS argues:   (1) Section 5707 of the Law constitutes an unconstitutional delegation of legislative power; (2) BCS has a protected property interest in the performance of taxicab operations within the City that is afforded due process protection; (3) Section 5707.1 of the Law does not afford BCS adequate procedural due process; (4) the Authority failed to produce records as required by Section 5707(b) of the Law in violation of BCS's right to due process; and (5) this matter should be remanded to the Authority for further proceedings in light of this Court's decision in *Bucks County Services, Inc. v. Philadelphia Parking Authority* (Pa. Cmwlth., No. 584 M.D. 2011, filed November 28, 2016) (single-judge opinion by Brobson, J.).[15]

## A.  Arbitrary and Unreasonable

First, we address GCC's argument that Section 5707(c) of the Law is arbitrary and unreasonable.   More specifically, GCC argues that Section 5707(c) imposes a disproportionate regulatory and financial burden on

---

[14] Throughout its brief, GCC relates its arguments to both Section 5707(c) of the Law and "its accompanying regulations."   GCC does not, however, identify which "accompanying regulations" it is challenging.   As a result, we view GCC's arguments as a challenge to Section 5707(c) of the Law only, and we will treat GCC's arguments as such throughout the remainder of this opinion.

[15] The Authority and the PUC filed notices of appeal with the Pennsylvania Supreme Court on January 23, 2017, and February 2, 2017, respectively.   Pursuant to Commonwealth Court Internal Operating Procedure § 414(b), a single-judge opinion of the Commonwealth Court in a non-election matter, "even if reported, shall be cited only for its persuasive value and not as a binding precedent."

15

partial rights taxicab companies because partial rights taxicab companies are required to pay the same assessment of $1,457 per taxicab paid by medallion taxicabs but, unlike medallion taxicabs, cannot operate on a citywide basis. GCC requests that this Court adopt the ruling in *Bucks County Services*, regarding the Authority's failure to consider the material differences between medallion and partial rights taxicabs in the promulgation of its regulations and the undue burden placed upon partial rights taxicabs as a result thereof, and conclude that the Authority's assessment against GCC for fiscal year 2015 in the amount of $246,233 is invalid, void, and unenforceable.

In *Bucks County Services*, this Court invalidated certain of the Authority's *regulations* because they evidenced a purely arbitrary exercise of the Authority's rulemaking power.[16] *Bucks County Services*, slip op. at 33-38. In so doing, this Court relied upon *Tire Jockey Service, Inc. v. Department of Environmental Protection*, 915 A.2d 1165 (Pa. 2007), a decision in which the Pennsylvania Supreme Court reviewed certain regulations issued pursuant to a Commonwealth agency's rule-making power. *Tire Jockey* does not apply to this case because GCC is seeking to invalidate Section 5707(c) of the Law, not regulations issued pursuant to the Authority's rule-making power. While we recognize that this case may involve some of the same principles, we will not apply *Bucks County Services* to GCC's current challenge. As a result, we decline to adopt *Bucks County Services* as a basis to conclude that the Authority's assessment

---

[16] On January 3, 2017, this Court amended its original decision in *Bucks County Services* and declared only certain of the Authority's regulations invalid and unenforceable with respect to all partial rights taxicabs operating within the City.

16

against GCC for fiscal year 2015 in the amount of $246,233 is invalid, void, and unenforceable.

## B. Substantive Due Process

Next, we address GCC's and BCS's substantive due process arguments. More specifically, BCS argues that common pleas erred in concluding that BCS did not have a property interest in the performance of taxicab operations within the City that is protected by the due process clauses of the United States and Pennsylvania Constitutions. GCC argues that Section 5707(c) of the Law violates GCC's substantive due process rights because it is unclear and vague and does not adequately define which partial rights taxicabs must be listed on the PR-1 form and which partial rights taxicabs are subject to the payment of the annual assessment. In response, the Authority argues that BCS and GCC have failed to establish that their substantive due process rights were violated because: (1) there is no fundamental right to provide call or demand taxicab service in the City; and (2) Section 5707(c) of the Law serves a legitimate governmental objective of regulating taxicab service in the City.

Substantive due process rights emanate from Article I, Section 1 of the Pennsylvania Constitution, which provides: "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." The Pennsylvania Supreme Court has explained:

> [F]or substantive due process rights to attach[,] there must first be the deprivation of a property right or other interest that is constitutionally protected. Pursuant to Article I, Section 1 of the Pennsylvania Constitution, all persons within this Commonwealth possess a protected interest in the practice of their profession. Thus, after a

17

license to practice a particular profession has been acquired, the licensed professional has a protected property right in the practice of that profession. Nevertheless, the right to practice a chosen profession is subject to the lawful exercise of the power of the [Commonwealth] to protect the public health, safety, welfare, and morals by promulgating laws and regulations that reasonably regulate occupations.

*Khan v. State Bd. of Auctioneer Examiners*, 842 A.2d 936, 946 (Pa. 2004) (citations omitted). In *Bucks County Services*, this Court held that the issuance of certificates of public convenience to Appellants is akin to the issuance of a license to practice a profession, and, therefore, Appellants have a protected property interest in the performance of taxicab operations within the City. *Bucks County Services*, slip op. at 45; *see also MCT Transportation*, 60 A.3d at 915-19 (recognizing that partial rights taxicab companies have protected property interest for purposes of procedural due process analysis). We adopt this holding.[17]

"While the right to engage in a particular profession is an important right, it is not a fundamental one." *Johnson v. Allegheny Intermediate Unit*,

_____

[17] Pursuant to Commonwealth Court Internal Operating Procedure 414(a), "[a]n unreported opinion of this [C]ourt may be cited and relied upon when it is relevant under the doctrine of law of the case, res judicata or collateral estoppel." "Collateral estoppel bars a claim raised in a subsequent action where (1) an issue decided in a prior action is identical to one presented in a later action, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party to the prior action or in privity with a party to the prior action, and (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior action." *Pennsylvania Social Servs. Union, Local 688 of the Serv. Emps. Int'l Union v. Commonwealth*, 59 A.3d 1136, 1143-44 (Pa. Cmwlth. 2012). The issue of whether partial rights taxicab companies have a protected property interest in the performance of taxicab operations within the City was decided by this Court in *Bucks County*, and we cite and rely upon that decision pursuant to the doctrine of collateral estoppel and Commonwealth Court Internal Operating Procedure 414(a).

59 A.3d 10, 21 (Pa. Cmwlth. 2012). "Thus, 'while a state may regulate a business which affects the public health, safety and welfare, it may not, through regulation, deprive an individual of his right to conduct a lawful business unless it can be shown that such deprivation is reasonably related to the state interest sought to be protected.'" *Id.* (quoting *Sec'y of Revenue v. John's Vending Corp.*, 309 A.2d 358, 361 (Pa. 1973)). "A law that purports to be an exercise of police power must not be arbitrary, unreasonable or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained." *Dranzo v. Winterhalter*, 577 A.2d 1349, 1355 (Pa. Super. 1990), *appeal denied*, 585 A.2d 468 (Pa. 1991). In short, "[t]he substantive protections of due process are meant to protect citizens from arbitrary and irrational actions of the government." *Johnson*, 59 A.3d at 20.

The Authority argues that Section 5707(c) of the Law furthers the legitimate governmental objective of regulating taxicab service in the City for the benefit of the public. We agree. Section 5707(c) of the Law is part of a statutory assessment scheme with a stated purpose of protecting the health, safety, and welfare of the public through the "development of a clean, safe, reliable[,] and well-regulated taxicab . . . industry" in the City. 53 Pa. C.S. § 5701.1. The Authority argues further that Section 5707(c) of the Law "is presumed constitutional under a rational basis challenge [because] it furthers a legitimate governmental objective in regulating the provision of taxicab service in [the City]." (Authority's Br. at 23.) After carefully reviewing the taxicab assessment scheme set forth in Section 5707(c) of the Law, we struggle, however, to find any real and substantial relation between this goal and the assessment scheme.

The purpose of Section 5707(c) of the Law is to generate the funds necessary to cover the deficit in the Authority's budget allocated to the regulation of taxicab operations within the City. *See* 53 Pa. C.S. § 5707(a)(2)-(3). For assessment purposes, Section 5707(c) of the Law provides that the taxicab utility group includes medallion cabs and all partial rights taxicabs authorized to do business in the City. This is where the assessment scheme begins to break down. The statute requires the Authority to calculate a per-taxicab assessment by "estimating" the number of taxicabs that will be "in service during the next fiscal year" and then dividing the total assessment to arrive at the per-taxicab assessment. With respect to medallion taxicabs, however, no estimation is necessary. The number of medallion taxicabs that will be in service within the City is finite and known. *See* Section 5711(c)(2) of the Law (fixing the number of certificates of public convenience and corresponding medallions for citywide taxicab service). Medallion taxicabs are not regulated on a fleet basis, and their "in service" territory is coterminous with the City limits. The same, however, is not true of partial rights taxicabs.

So when the General Assembly provides in Section 5707(c)(1)(iii) of the Law that the Authority must arrive at an "estimate" of the total number of taxicabs in service, it necessarily means that the Authority must arrive at an estimate of how many *partial rights* taxicabs will be "in service" during that time. Recognizing this, the General Assembly included Section 5707(c)(1)(ii) of the Law, which requires all partial rights taxicab companies to file an annual statement with the Authority "under oath *estimating* the number of taxicabs it will have in service in the next fiscal year." (Emphasis added.) The General Assembly, however, provided no guidance on how partial rights taxicab companies or the

20

Authority are to arrive at these "estimates." Unlike medallion taxicabs, the number of partial rights taxicabs operating within the City during any given day, month, or even year is not finite or fixed. It is not set by statute. Rather, it is determined predominantly by two factors: (1) the number of vehicles that the fleet owner chooses to place in service generally (*i.e.*, throughout its service territory, which includes, but is not limited to, only certain designated sections of the City); and (2) customer demand. Without any guidance from the General Assembly on how to estimate the number of vehicles that will be "in service" in the City for the next fiscal year, there may be as many methods at arriving at these mandated statutory estimates as there are partial rights taxicab companies. Moreover, there is no mechanism to reconcile at the end of the fiscal year the estimates with actuals. The General Assembly has constructed a mechanism to funnel millions of dollars into a government agency from the private sector without any mechanism to ensure fairness, consistency, or accuracy.

In addition, Section 5707(c) of the Law fails to take into consideration the obvious differences between medallion taxicabs and partial rights taxicabs. It assesses medallion taxicabs, which by law are always "in service" within the City and have the most expansive operating rights and broadest service territory, the same amount as partial rights taxicabs, which are fleet-authorized and have an operating territory that consists of areas outside of the City and, unlike medallion taxicabs, only designated portions of the City. This is arbitrary, unreasonable, and irrational. Medallion taxicabs and partial rights taxicabs may be providing the same service to the customers that they serve within the City (point-to-point transportation), but medallion taxicabs undeniably enjoy broader service rights within the City. Imposing a per taxicab assessment on a fleet of partial rights

21

taxicabs without any confirmation that each partial rights taxicab within such fleet could or did operate within the City on the same level as a medallion taxicab is arbitrary and unreasonable. In crafting a reasonable assessment scheme, in addition to correcting the deficiencies noted above, the General Assembly must take into consideration that partial rights taxicabs are fleet-authorized and have restricted "in service" territories. Otherwise, partial rights taxicabs are potentially responsible for more than their proportionate share of the costs of taxicab regulation within the City.

For these reasons, the assessment scheme set forth in Section 5707(c) of the Law is arbitrary and unreasonable and lacks any real and substantial relation to the goal of regulating taxicab service within the City for the benefit of the public. It, therefore, violates Appellants' rights to substantive due process. For these reasons, we must conclude that Section 5707(c) of the Law is facially unconstitutional.

### C. Equal Protection and the Uniformity Clause of the Pennsylvania Constitution

Next, we will address GCC's argument that Section 5707(c) of the Law violates GCC's right to equal protection and the Uniformity Clause of the Pennsylvania Constitution.[18] More specifically, GCC argues that even though the Authority charges a per taxicab assessment, the Authority's "one-size-fits-all" assessment scheme imposes substantially disproportionate and inequitable assessments upon partial rights taxicab companies and medallion taxicabs. In

---

[18] The Uniformity Clause of the Pennsylvania Constitution provides: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Pa. Const. art. 8, § 1.

22

response, the Authority argues: (1) GCC has not received disparate treatment because GCC and other partial rights taxicab companies are treated in the same manner as medallion taxicabs, which is consistent with the definition of taxicab under Section 5701 of the Law; and (2) treating all taxicabs providing service within the City in the same manner is reasonable and bears a rational relationship to the purpose of the Law.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Similarly, Article I, Section 26 of the Pennsylvania Constitution provides that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."[19] In matters of taxation, "allegations of violations of the equal protection clause and the Pennsylvania Constitution Uniformity Clause are to be analyzed in the same manner." *In re Springfield Sch. Dist.*, 879 A.2d 335, 340 (Pa. Cmwlth. 2005). "The Equal Protection Clause, however, does not obligate the government to treat all persons identically, but merely assures that all similarly situated persons are treated alike." *Small v. Horn*, 722 A.2d 664, 672 (Pa. 1998). While not in the context of an equal protection argument, this Court, in *Bucks County Services*, recognized that there are material differences between the operations of medallion taxicabs and partial rights taxicabs

---

[19] "The equal protection provisions of the Pennsylvania Constitution are analyzed . . . under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution." *Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (Pa. 1991).

within the City. *Bucks County Services*, slip op. at 16-19. As a result of these material differences, partial rights taxicab companies and medallion taxicabs are not similarly situated and, therefore, need not be afforded equal protection. The converse is also true—because partial rights taxicab companies and medallion taxicabs are not similarly situated, the Equal Protection Clause does not demand identical treatment. For these reasons, we reject GCC's argument that Section 5707(c) of the Law violates GCC's right to equal protection and the Uniformity Clause of the Pennsylvania Constitution.

### D. *MCT Transportation* Part II – Unconstitutional Delegation of Legislative Power

Next, we will address BCS's argument that Section 5707 of the Law constitutes an unconstitutional delegation of legislative power. More specifically, BCS argues that Section 5707 of the Law represents an unconstitutional delegation of legislative power because: (1) the General Assembly failed to set any definite standards, policies, or limitations on the Authority's power to set its budget or the amount and subject of its annual expenditures; (2) submission of the Authority's budget to the Governor and General Assembly pursuant to the appropriations process does not remedy the unlawful delegation of legislative power found by this Court in *MCT Transportation*; (3) Section 5707 of the Law grants the Authority unlimited discretion on how to allocate its expenses among the three utility groups; and (4) Section 5707 of the Law grants the Authority unlimited discretion in formulating its annual fee schedule. In response, the Authority argues that there was no unlawful delegation of legislative power to the Authority because the Authority's budget request is reviewed by the Governor's office and ultimately approved by the General Assembly.

"[T]he separation of powers doctrine provides that the executive, legislative, and judicial branches of government are equal and none should exercise powers exclusively committed to another branch." *Jefferson Cnty. Court Appointed Emps. Ass'n v. Pa. Labor Relations Bd.*, 985 A.2d 697, 702 n.8 (Pa. 2009). "'Its object is basic and vital[:] . . . to preclude a commingling of these essentially different powers of government in the same hands.'" *Seitzinger v. Commonwealth*, 25 A.3d 1299, 1305 (Pa. Cmwlth. 2011) (quoting *O'Donoghue v. United States*, 289 U.S. 516, 530 (1933)), *aff'd per curium*, 54 A.3d 20 (Pa. 2012). "The legislative power of this Commonwealth [is] vested in [the] General Assembly." Pa. Const. art. II, § 1. The General Assembly may not delegate its power to make laws, however, "where necessary, [it] may confer authority and discretion in another body in connection with the execution of a law." *Commonwealth v. Cherney*, 312 A.2d 38, 40 (Pa. 1973). "For the legislative grant of authority or discretion to be valid, the legislation granting such authority must contain adequate standards [that] will guide and restrain the exercise of the delegated administrative functions." *Id.* at 41. The General Assembly "must make the basic policy choices, but it can 'impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions' of the statute." *MCT Transportation*, 60 A.3d at 904 (quoting *Chartiers Valley Joint Sch. v. Cnty. Bd. of Sch. Dirs. of Allegheny Cnty.*, 211 A.2d 487, 492 (Pa. 1965)). "In determining whether adequate standards have been established, we are not limited to the mere letter of the law, but must look to the underlying purpose of the statute and its reasonable effect." *Cherney*, 312 A.2d at 41.

Through the enactment of Act 64, the General Assembly corrected some, but not all, of the problems identified by this Court in *MCT Transportation*.

While Section 5707 of the Law now requires that the Authority prepare and submit its budget to the Governor and General Assembly for approval (consistent with Article VI of the Administrative Code of 1929) and Section 5710 of the Law sets forth an initial fee schedule for the Authority, the General Assembly has still failed to establish any standards that direct, guide, or restrain the Authority's exercise of discretion in formulating its budget and fee schedule or direct the Authority on how costs and expenses should be allocated among the utility groups. The language "necessary for the administration and enforcement of this chapter" contained in Section 5707(a)(1), relative to the Authority's budget, and in Section 5710(a), relative to the Authority's fee schedule, provides no more standards, guidance, instructions, or limits than the "necessary to advance the purposes of this chapter" language of former Section 5707(b). As stated by this Court in *MCT Transportation*, it is for the General Assembly to decide what is necessary, not the Authority. The General Assembly must establish a standard for the Authority to apply in establishing its budget and fee schedule. It is not sufficient that the General Assembly reviews and approves the budget and fee schedule after the fact, because there is no way to know what standards have been applied by the Authority in the formulation of the budget and fee schedule. Thus, we conclude that Section 5707 of the Law is an unconstitutional delegation of legislative power.

### E.   Procedural Due Process

Next, we will address BCS's argument that Section 5707.1 of the Law does not afford BCS adequate procedural due process. More specifically, BCS argues that it has a protected property interest in the performance of taxicab services. BCS argues further that Section 5707.1 of the Law does not provide for meaningful administrative or judicial review of the Authority's budget and fee

26

schedule because a partial rights taxicab company that objects to the amount of the assessment by filing an appropriate challenge is left with two untenable options: (1) pay the assessment, or (2) risk the possibility of revocation of its operating rights. BCS and other partial rights taxicab companies, therefore, could be deprived of their protected property interest without a prior hearing, because a partial rights taxicab company that challenges, but does not pay, the assessment, is subject to a potential revocation of its operating rights. BCS also argues that a partial rights taxicab company may even be required to defend itself in an enforcement proceeding for nonpayment of the assessment before there is a determination on the validity of such assessment—*i.e.*, a final resolution of the proceedings involving the challenge to the assessment pursuant to Section 5707.1 of the Law. In response, the Authority argues that BCS has not been deprived of life, liberty, or property because there is no fundamental or constitutional right to provide call or demand taxicab service within the City. The Authority argues further that BCS was afforded adequate notice and had an opportunity to be heard because the record reflects: (1) BCS had notice of the Authority's budget request; (2) the Authority notified BCS that its PR-1 form for fiscal year 2015 was required to be filed no later than March 31, 2014; (3) the Authority served BCS with notice of the $1,457 per taxicab assessment for fiscal year 2015; (4) BCS's assessment had to be paid by September 8, 2014; (5) BCS filed an administrative appeal with the Authority relative to the assessment; (6) BCS received an administrative hearing before a hearing officer who issued findings of fact and conclusions of law; and (7) BCS exercised its right to appeal and was heard by common pleas.

27

"[T]he right to procedural due process only attaches where there is an alleged deprivation of a protected property or liberty interest." *Mun. Auth. of Borough of W. View v. Pub. Util. Comm'n*, 41 A.3d 929, 936 (Pa. Cmwlth. 2012). "[T]he essential elements of procedural due process are 'notice and [an] opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause.'" *Bornstein v. City of Connellsville*, 39 A.3d 513, 519 (Pa. Cmwlth. 2012) (quoting *Fiore v. Bd. of Fin. & Revenue*, 633 A.2d 1111, 1114 (Pa. 1993)). "To condemn without a hearing is repugnant to the due process clause." *Nat'l Auto. Serv. Corp. of Pa. v. Barford*, 137 A. 601, 602 (Pa. 1927). "Because due process applies to administrative officials, 'there must be a hearing somewhere, at some stage in the proceeding, even if it be after the property itself is parted with,' in order for the agency's action to comport with due process." *MCT Transportation*, 60 A.3d at 916 (quoting *Nat'l Auto*, 137 A. at 602).

As stated above, partial rights taxicab companies, as the holders of certificates of public convenience, have a protected property interest in the performance of taxicab operations within the City. Thus, the right to procedural due process is implicated in this matter and the question becomes whether Section 5707.1 of the Law provides notice and an opportunity to be heard. Section 5707.1(a)(1) of the Law provides BCS with notice sufficient to satisfy procedural due process standards, as it requires the Authority to provide notice of the assessment by electronic mail and by posting on the Authority's website. Likewise, Section 5707.1(b)(1)-(2) of the Law provides BCS with an opportunity to be heard sufficient to comport with procedural due process standards, as it permits BCS to challenge the assessment by filing a petition with the Authority

28

within fifteen days of receipt of such notice and entitles BCS to a hearing on such petition. Even though BCS is not relieved from its obligation to pay the assessment pending the challenge (*see* Section 5707.1(b)(3) of the Law) and could suffer a revocation of its operating rights before it is entitled to a hearing if it fails to pay the assessment, BCS is still afforded sufficient procedural due process because BCS is entitled to a hearing "at some stage in the proceeding." *See MCT Transportation*, 60 A.3d at 916. For these reasons, we reject BCS's argument that Section 5707.1 of the Law does not afford adequate procedural due process.

### F. Production of Records Pursuant to Section 5707(b) of the Law

Next, we will address BCS's argument that the Authority failed to produce records as required by Section 5707(b) of the Law in violation of BCS's right to due process. More specifically, BCS argues that it is impossible to challenge the basis for the Authority's assessment calculation without access to the records of the costs incurred in connection with the regulation of each utility group within the City, as well as the records of the manner in which the Authority determined the amount assessed against each utility group. BCS argues further that if you accept the Authority's interpretation of Section 5707(b) of the Law— *i.e.*, the Authority is only required to produce the annual budget documents submitted to the Governor—the utility groups will only have access to the amount budgeted to each utility group and not the actual basis for the allocation.

While we need not address this issue in light of our conclusion that Section 5707 of the Law is an unconstitutional delegation of legislative authority and violates Appellants' substantive due process rights, we note that Section 5707(b) of the Law is very clear. The Authority is required to maintain and make available for inspection records of the costs incurred in connection with

29

its regulation of taxicabs, limousines, and dispatchers and of the manner in which it determined the assessment against taxicabs, limousines, and dispatchers. We interpret this language to require the Authority to maintain and make available much more than the budget documents submitted to the Governor and General Assembly pursuant to Section 5707(a) of the Law. Had the General Assembly intended for the Authority to only maintain and make available the budget submission documents, it could have stated that very simply in Section 5707(b) of the Law. The General Assembly did not do so, and, therefore, we can only conclude that it intended the Authority to produce more than just the budget submission documents.

### G. Remand Request

Finally, we will address BCS's argument that this matter should be remanded to the Authority for further proceedings in light of this Court's decision in *Bucks County Services*. More specifically, BCS argues that this matter should be remanded because 52 Pa. Code § 1011.3, the regulation upon which the Authority relies to estimate the number of vehicles that will be operating in the City during the upcoming fiscal year and to calculate the amount of the annual assessment, was invalidated by this Court in *Bucks County Services*. In response, the Authority argues that this Court's holding in *Bucks County Services* should not control the issues presented in this matter because the *Bucks County Services* decision: (1) is on appeal to the Pennsylvania Supreme Court and, therefore, is subject to an automatic *supersedeas*; and (2) did not invalidate Section 5707(c) of the Law. Because we are affording Appellants the ultimate relief that they have requested—*i.e.*, holding that Section 5707 of the Law is an unconstitutional

30

delegation of legislative authority and violates Appellants' substantive due process rights—a remand of this matter is unnecessary.

### III. CONCLUSION

Based on the reasons discussed above, we reverse common pleas' order.

_____
P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Germantown Cab Company,                     :
Bucks County Services, Inc., Concord        :
Limousine, Inc., Dee Cab                     :
Company and MCT Transportation,              :
Inc.                                         :
                                             :
                                             :
            v.                               :       No. 1989 C.D. 2016
                                             :
Philadelphia Parking Authority              :
                                             :
Appeal of: Bucks County Services, Inc.      :
                                             :
Germantown Cab Company,                     :
Bucks County Services, Inc., Concord        :
Limousine, Inc., Dee Cab                     :
Company and MCT Transportation              :
                                             :
            v.                               :       No. 1990 C.D. 2016
                                             :
Philadelphia Parking Authority              :
                                             :
Appeal of: Germantown Cab Company           :


# **O R D E R**


AND NOW, this 13th day of September, 2017, the order of the Court of Common Pleas of Philadelphia County is hereby REVERSED.


_____
P. KEVIN BROBSON, Judge